# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### NORTHERN DIVISION

**PAMELA JOYCE CRABTREE**                                             **PLAINTIFF**

**VS.**                      **CASE NO. 3:22-CV-00036  PSH**

**KILOLO KIJAKAZI, Acting Commissioner,**
   **Social Security Administration**                      **DEFENDANT**

## ORDER

Plaintiff Pamela Joyce Crabtree ("Crabtree"), appeals the final decision of the Acting Commissioner of the Social Security Administration (defendant "Kijakazi") to deny her claim for Supplemental Security Income ("SSI").  Crabtree maintains the Administrative Law Judge ("ALJ") failed to properly determine her residual functional capacity ("RFC") when he did not properly evaluate the opinion of consultative examiner Catherine Adams, Ph.D. ("Adams").  The parties have ably summarized the testimony given at the administrative hearing conducted on January 27, 2021.  (Tr. 31-55).  The Court has carefully reviewed the record, including the medical records, to determine whether there is substantial evidence in the administrative record to support Kijakazi's decision.  42 U.S.C. § 405(g).  The relevant period under consideration is from January 6, 2020, the alleged onset date,

through June 29, 2021, the date of the ALJ's decision.

*Crabtree's Claim for Relief*

Crabtree contends the ALJ failed to comply with the relevant regulations for evaluating medical opinion evidence when considering the opinions of consultative examiner Adams, who offered her opinions in November 2019.  (Tr. 517-523).

The regulations governing the consideration of the medical opinions were revised for claims filed on or after March 27, 2017.  Crabtree filed her claim in July 2019.  The new regulations eliminated the "long-standing 'treating physician' rule." *See Fatuma A. v. Saul*, 2021 WL 616522, 5 (D. Minn. 2021), report and recommendation adopted, 2021 WL 615414 (D. Minn. 2021).  The regulations now provide the following:

> ... Under the new regulatory scheme, the Commissioner "will not defer or give any specific weight, including controlling weight, to any medical opinion(s)," including those from treating physicians. 20 C.F.R. 404.1520c(a). Instead, ALJs will determine the persuasiveness of each medical source or prior administrative medical findings based on supportability; consistency; relationship with the claimant; specialization; and any other factor that tends to support or contradict a medical opinion. 20 C.F.R. 404.1520c(a), (c). ALJs are required to "explain" their decisions as to the two most important factors—supportability and consistency. 20 C.F.R. 404.1520c(b)(2). The "more relevant the objective medical evidence and supporting explanations presented" and the "more consistent" a medical opinion is with evidence from other medical and non-medical sources, the more persuasive the opinion should be. 20 C.F.R. 404.1520c(c)(1)-(2).
> The new articulation requirements are meant to "provide individuals with a better understanding of [the Commissioner's] determinations and

decisions" and "provide sufficient rationale for a reviewing adjudicator or court." Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 FR 5844-01, at 5854, 5858 (January 18, 2017). ...

*See Phillips v. Saul*, 2020 WL 3451519, 2 (E.D. Ark. 2020) (Deere, MJ).

The new regulations require the ALJ to discuss, at a minimum, the supportability and consistency of a medical opinion. Crabtree maintains the ALJ fell short of the requirements with regard to both supportability and consistency. Prior to addressing supportability and consistency it is helpful to detail Adams' report and the ALJ's treatment of that report.

**Adams' Findings:** Crabtree was 49 years old when she presented to Adams on November 27, 2019. Adams' observations and opinions were recorded in her report under eight headings, as described below:

1. Mental Allegations: Crabtree reported her life had deteriorated following the death of her 24 year old son in 2009, she did not perform personal hygiene without prompting from others, had panic attacks almost daily, had nightmares, had anger outbursts, got violent, was "never happy," was recently mean to her six puppies, had not brushed her teeth in "I don't know how long," does not cook, does not keep house or do yard work, cannot function if she smells cologne, denied suicidality, prefers to stay at home due to worries about what may happen, sleeps poorly, can sleep 2-3 hours with medication, smokes when she wakes up and then goes back to sleep.

Adams noted Crabtree's psychosis as hearing voices but being unable to decipher what is being said, her mood as sad, scared, and hopeless, her personality to suggest a personality disorder including some dependent and histrionic traits, and Adams noted Crabtree was missing two bottom front teeth. (Tr. 519).

2.   History of Psychiatric Treatment: Crabtree reported no hospitalization, being seen by Dr. Goble ("Goble") but being unable to get therapy, which was prescribed for weekly sessions, due to lack of transportation.  Goble was cited as prescribing Seroquel, Xanax, and Zoloft, which produced side effects of drowsiness and feeling loopy but otherwise "they work good." (Tr. 519).

3.    Relevant Personal and Employment History: Crabtree reported living alone although her boyfriend stays often.  She indicated she is angry often and is abusive toward her boyfriend, and has a history of six arrests for assaults.  She denied cooking, cleaning, and driving (her license was revoked), but grocery shops in small doses. Crabtree indicated she manages money independently, and has an eighth grade education and lacked only the math portion toward earning a GED.  Crabtree's most recent job, for one month, was at a chicken processing plant in 2009.  Prior to that job she was a hotel housekeeper, and she reported difficulties getting along with others.

4.   Substance Abuse: Crabtree denied substance abuse.

5.   Mental Status Information: Crabtree was dressed appropriately, unkempt, open

4

and cooperative in providing information, with a dysthymic mood, appropriate affect, with rate, rhythm, volume, and tone of speech mostly within normal limits, no loose associations, no odd thought processes, no evidence of psychosis during the interview, and alert and fully oriented in all spheres. Crabtree identified four recent presidents, knew the name of the Arkansas governor, three states bordering Arkansas, did not know how many weeks were in a year, and stated she was about to have a panic attack when recalling numbers in sets of three starting at 100. Adams found Crabtree was not functioning within or near the mentally retarded range.

6. Differential Diagnostic Formulation/Conclusions: Adams diagnosed Crabtree with posttraumatic stress disorder and depressive disorder, not otherwise specified.

7. Adaptive Functioning: Adams opined that Crabtree's difficulties seem to interfere with age-appropriate activities of daily living such as driving, grocery shopping, and relationships, and that her interactions during the interview were at times socially awkward due to her histrionic style. Further, Crabtree communicated in a "manner that was mostly effective and intelligible." (Tr. 521). Adams found Crabtree had moderate to severe difficulty coping with work-like demands, moderate difficulty attending and sustaining concentration on basic tasks, moderate to severe difficulty sustaining persistence in completing tasks, and moderate to severe difficulty completing tasks within an acceptable timeframe.

8. Validity: Adams deemed the evaluation valid, and found Crabtree able to manage funds without assistance.

**The ALJ's Consideration of Adams' Report:** When addressing whether Crabtree's impairments met a Listing, the ALJ considered the "paragraph B" criteria, an examination of four areas of mental functioning. In this context, the ALJ cited Adams' findings. For example, the ALJ determined Crabtree had a mild limitation in her ability to understand, remember, or apply information. The ALJ noted Adams found Crabtree could recall six digits forward and five digits backward and could recall three of three objects immediately and two of three objects after a five minute delay.

The ALJ assessed a moderate limitation in Crabtree's ability to interact with others, again citing Adams' notation of reports of violence and panic attacks along with her cooperative manner during the examination. Additionally, when the ALJ found a moderate limitation in Crabtree's ability to concentrate, persist, or maintain pace, he cited Adams' determination that Crabtree had difficulty performing serial threes.

In the fourth and final area of functioning, adapting or managing oneself, the ALJ found Crabtree had a mild limitation. He again cited Adams' findings, along with findings from other treating medical providers. The ALJ ultimately concluded,

based on his analysis of Adams' and other medical providers' reports, that Crabtree did not satisfy the "paragraph B" criteria and therefore did not meet a Listing. (Tr. 17-18).

The ALJ proceeded to assess Crabtree's residual functional capacity ("RFC"), finding she could perform light work with numerous restrictions, including only occasional contact with the general public, simple instructions and simple tasks requiring little judgment, and a work setting with only occasional changes. Within this portion of the decision the ALJ summarized the November 2019 consultative examination by Adams, highlighting Crabtree's self reports, Adams' observations, and Crabtree's mental status information. (Tr. 20-21).

The ALJ then considered the medical opinions of the state agency experts, both physical and mental, and the opinion of Adams, as set forth below:

> Dr. Adams determined the claimant's interactions were at times socially awkward and that she has moderate to severe difficulty coping with work-type demands, attending and sustaining concentration on basic tasks, sustaining persistence in completing tasks, and completing tasks within an acceptable timeframe. The undersigned does not find this opinion to be persuasive, given that while it is partially supported by Dr. Adams's examination and partially consistent with the record available at the time of this decision, it does not provide any specific mental functional limitations. Dr. Adams noted the claimant was unkempt with a depressed mood and affect but was cooperative, alert, and fully oriented with appropriate attire, mostly normal speech, normal thought process, and no evidence of psychosis. Additionally, while the claimant had difficulty performing serial threes and reported almost having a panic attack while doing so, Dr. Adams determined the claimant could

recall six digits forward and five digits backward, could recall three of three objects immediately and two of three objects after a five-minute delay.  Further, although the claimant reported having violent outbursts and frequently had a depressed or anxious mood and affect, she was frequently cooperative, her symptoms improved with medication, and her other examiners did not consistently note any confusion, distractibility, forgetfulness, or inattentiveness. [the ALJ then cited to 12 transcript entries of other examiners].

(Tr. 22).

**Supportability:** Crabtree faults the ALJ's conclusion discounting Adams' opinion because "it does not provide any specific mental functional limitations." (Tr. 22, plaintiff's brief at 11).  She contends that Adams' findings in three areas are indeed specific mental functional limitations – Adams opined Crabtree had moderate to severe difficulty in (1) coping with work-type demands, (2) sustaining persistence in completing tasks, and (3) completing tasks within an acceptable timeframe.  (Tr. 522).  Crabtree urges that these specific findings were entitled to greater weight than given by the ALJ.  For two reasons, the Court disagrees with this argument.

First, Adams' findings could be viewed as broad conclusions, lacking specifics which would be applicable to particular job settings.  For example, while Adams' report uses general terms such as work-type demands and completing tasks, it does not address whether these limitations would preclude Crabtree from performing specific jobs with occasional contact with the general public, with simple instructions, simple tasks requiring little independent judgment, with only occasional changes in the work

8

setting.  Merchandise marker and mail clerk, the jobs identified by the vocational expert as available to Crabtree, are examples of these types of unskilled jobs.  There is merit in the ALJ's citation of the lack of specific mental functional limitations in Adams' report.

Second, even if the ALJ placed too much emphasis on the want of specific mental limitations this reliance was not the only reason the ALJ found Adams' opinions were not persuasive.  The ALJ also stressed Adams' opinions were only "partially supported" by her examination.  (Tr. 22).  This partial support from the examination is reflected in the varying findings cited by the ALJ.  For instance, Crabtree was reported to be unkempt with a depressed mood and affect but also found to be open, cooperative, alert, and fully oriented with appropriate attire, mostly normal speech, normal, thought processes, and no evidence of psychosis.  The ALJ also noted Crabtree struggled with performing serial threes.  On the other hand, Crabtree could recall six digits forward and five digits backward.  Thus, the examination did not produce results which uniformly supported Adams' conclusions.        It is not the role of the Court to re-weigh the evidence and, even if this Court would decide the case differently, it cannot reverse the ALJ's decision if that decision is supported by good reason and based on substantial evidence. *See Dillon v. Colvin*, 210 F.Supp.3d 1198 (D.S.D. 2016).  Here, the evidence is capable of more than one acceptable

characterization, and the ALJ could find as he did with respect to the supportability of Adams' opinions.

**Consistency:** The ALJ found Adams' November 2019 opinion was not persuasive because is was partially consistent with the record and because other examiners did not consistently note any confusion, distractibility, forgetfulness, or inattentiveness.  Other examiners included:

* Clarity Health & Wellness, in January 2020, where Crabtree was "dressed casually, kempt, with normal gait . . . cooperative . . . appropriate eye contact" with normal speech, neutral mood, linear thought process, fair insight and judgment.  (Tr. 531).

* Harris Medical Center, in January 2020, where Crabtree was oriented to person, place, and time, with normal affect.  (Tr. 570).

* Unity Health Harris Medical Clinic, in February 2020, where Crabtree was oriented to time, place, and person, alert, with appropriate mood and affect. (Tr. 580).

* Clarity Health & Wellness, in January 2021, where Crabtree reported in a phone session that she was doing well and sleeping fine, with improving depression, and the examiner noted normal speech, speech rate, and rhythm, euthymic mood, and no impairment of thought processes.  (Tr. 626).

\*        In eight other encounters with Clarity Health & Wellness, dating from February through December 2020, Crabtree presented with varying examination findings. In February, June, October, and December, Crabtree's mental examination was typically normal, and she was in no acute distress, with normal speech and thought process.  (Tr. 659, 649-650, 637, 629-630).  In phone sessions in July and September she was doing poorly, with dysphoric mood, poor insight, poor judgment, and abnormal speech.  (Tr. 641, 645).  In May and October her mental status was somewhat mixed – in May she was cooperative and not distractible, with unimpaired thought processes,  but depressed and anxious, and in October her appearance was normal but she was distractible and anxious. (Tr. 654-655, 632).

The ALJ is correct that these other treating examiners do not consistently align with the conclusions of Adams, who saw Crabtree on a single occasion.  The ALJ's comparison of Adams' findings to the findings of the other examiners was a proper consistency inquiry, and the variance in those documents is a valid basis for the ALJ's treatment of Adams' opinions.

The ALJ complied with the regulations and analyzed both the supportability and consistency of Adams' opinions.  Crabtree's claim to the contrary is without merit.  Since the treatment of Adams' opinions was supported by substantial evidence,

it follows that the RFC was not erroneous due to the error alleged by Crabtree.

In summary, the Court finds that the ultimate decision of Kijakazi was supported by substantial evidence. The Court is mindful that its task is not to review the record and arrive at an independent decision, nor is it to reverse if some evidence supports a different conclusion. The test is whether substantial evidence supports the ALJ's decision. *See, e.g., Byes v. Astrue*, 687 F.3d 913, 915 (8th Cir. 2012). This test is satisfied in this case

Accordingly, the final decision of Kijakazi is affirmed and Adams' complaint is dismissed with prejudice.

IT IS SO ORDERED this 21st day of February, 2023.

_____
UNITED STATES MAGISTRATE JUDGE